ORAL ARGUMENT NOT SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 20-1427
_____

SIERRA CLUB, APPALACHIAN VOICES,
BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE,
CHESAPEAKE CLIMATE ACTION NETWORK, CENTER FOR BIOLOGICAL
DIVERSITY, and HAW RIVER ASSEMBLY,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

On Petition for Review of Order of the Federal Energy Regulatory Commission,
171 FERC ¶ 61,232 (June 18, 2020)
_____

**INTERVENORS MONACAN INDIAN NATION'S AND SAPPONY
TRIBE'S CORRECTED PAGE-PROOF RULE 30(c) OPENING BRIEF**

L. Eden Burgess (D.C. Cir. Bar No. 49501)
William J. Cook (D.C. Cir. Bar No. pending)
Cultural Heritage Partners, PLLC
2101 L St., NW; Suite 800
Washington, DC  20037
(202) 567-7594
eden@culturalheritagepartners.com
will@culturalheritagepartners.com
*Counsel for Intervenors Monacan Indian Nation
and Sappony Tribe*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rules 28(a)(1) and (d), Intervenors Monacan Indian Nation ("the Monacans") and the Sappony Tribe ("the Sappony") (collectively, "the Tribes") submit this certificate of parties, rulings, and related cases.

## A. **<u>Parties and Amici</u>**

The Tribes incorporate by reference the list of parties and *amici* set forth in Petitioners' Page-Proof Rule 30(c) Opening Brief, at iv, as if set forth verbatim.

## B. **<u>Rulings Under Review</u>**

The Tribes incorporate by reference the list of orders set forth in the Petitioners' Page-Proof Rule 30(c) Opening Brief, at iv, as if set forth verbatim.

## C. **<u>Related Cases</u>**

The Tribes incorporate by reference the statement of related cases set forth in the Petitioners' Page-Proof Rule 30(c) Opening Brief, at iv, as if set forth verbatim.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES………iii

TABLE OF CONTENTS ……………………………………………………iv

TABLE OF AUTHORITIES …...…………………………………………vi

GLOSSARY………………………………………………………….. viii

JURISDICTIONAL STATEMENT   …………………………………… 1

STATUTES AND REGULATIONS ………………………............................ 1

STATEMENT OF ISSUES……………………………………………… 1

STATEMENT OF THE CASE ……………………………………………... 2

SUMMARY OF ARGUMENT……………………………………………… 2

STANDING ……………………………………………………………… 4

ARGUMENT ……………………………………………………………...7

I.      Standard of Review……………………………………..…………………………7

II.     FERC failed to conduct a lawful review of effects to historic properties as required under Section 106 of the National Historic Preservation Act … 8

III.    FERC failed to consult with the Tribes …………………………...19

IV.    FERC cannot delegate its responsibilities under Section 106 and is responsible for Mountain Valley's failure to coordinate properly..…….25

V.     FERC failed to take a "hard look" at the Project's effects on cultural or historic resources as required by NEPA..………………………………30

CONCLUSION AND RELIEF REQUESTED …………………………..31

# TABLE OF AUTHORITIES

**Cases**

*City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006) …………….....……… 3, 10

*Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698 (D.C. Cir. 2010) ……………. 7

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) …………... 7

*Duncan's Point Lot Owners Ass'n Inc. v. F.E.R.C.*, 522 F.3d 371 (D.C. Cir. 2008) ……………………………………………………………………….. 8

*Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246 (D.C. Cir. 1994) ………..… 6

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301 (D.C. Cir. 2015) ……………………………………………………………………… 7

*Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174 (4th Cir. 2005) ……..... 31

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989) ………….… 31

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ……………………………... 7

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.C. Cir. 2017) …………………………………………………… 30, 31

**Statutes**

15 U.S.C. § 717r(b) ………………………………………………………… 7

28 U.S.C. § 1362 …………………………………………………………... 7

54 U.S.C. § 306108 ……………………………………………………... 3, 8, 9, 10

54 U.S.C. §§ 300101-307108 …………………………………………………. 8

Section 1 of the Preservation Act, Pub. L. No. 89-665 (1966), as amended by Pub. L. No. 96-515 (1980)…………………………………………………… 8

Thomasina E. Jordan Act of 2017, Pub. L. No. 115-121 (2018) ………………… 4

**Regulations**

18 C.F.R. § 2.1c(a) ……………………………………………………….. 20, 22

18 C.F.R. § 2.1c(b) ………………………………………………………… 20

Fed. Energy Reg. Comm'n, *Policy Statement on Consultation with Indian Tribes in Commission Proceedings*, 18 C.F.R. § 2.1c …………………………………… 17

Fed. Energy Reg. Comm'n, *Revision to Policy Statement on Consultation with Indian Tribes in Commission Proceedings*, 18 C.F.R. Part 2, 84 Fed. Reg. 56940 (Oct. 2019) ……………………………………………………………………… 17

36 C.F.R. Part 800 …………………………………………………….... 10

36 C.F.R. § 800.1(a) ………………………………………………… 9

36 C.F.R. § 800.1(c) …………………………………………… 3, 10, 19

36 C.F.R. § 800.2(a)(4) …………………………………………... 3, 15

36 C.F.R. § 800.2(c)(2) ………………………………………… 9

36 C.F.R. § 800.2(c)(2)(ii)(A) ………………………………………… 12

36 C.F.R. § 800.2(4) ………………………………………………… 10

36 C.F.R. § 800.4 …………………………………………… 10, 25

36 C.F.R. § 800.14(b)(1)(i)-(ii) ………………………………………… 18

36 C.F.R. § 800.16(f) ………………………………………………… 13

36 C.F.R. § 800.6 …………………………………………… 10, 15

40 C.F.R. § 1508.27 …………………………………………………... 31

**Other Authorities**

Advisory Council on Hist. Pres., *Consultation Process Pursuant to E.O. 13175: Consultation and Coordination with Indian Tribal Governments* (Feb. 3, 2010) . 9

Advisory Council on Hist. Pres., *Limitations on the Delegation of Authority by Federal Agencies to Initiate Tribal Consultation under Section 106 of the National Historic Preservation Act* (July 1, 2011) ………………………………………... 25

*Consultation and Coordination with Indian Tribal Governments*, Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2009) ………………………………………… 9

JEFFREY L. HANTMAN, MONACAN MILLENNIUM: A COLLABORATIVE ARCHAEOLOGY AND HISTORY OF VIRGINIA INDIAN PEOPLE (2018) ……………… 5

Monacan Indian Nation, *Our History*, https://www.monacannation.com/our-history.html .................................................................................................5

THE SECRETARY OF THE INTERIOR'S STANDARDS AND GUIDELINES FOR FEDERAL AGENCY HISTORIC PRESERVATION PROGRAMS PURSUANT TO THE NATIONAL HISTORIC PRESERVATION ACT (Apr. 24, 1998) ………………………………… 9

Tribal Consultation and Strengthening Nation-to-Nation Relationships, WHITE HOUSE, 86 FED. REG. 7491 (Jan. 26, 2021) ……………………………………….. 9

White House Memorandum for the Heads of Executive Departments and Agencies (Nov. 5, 2009) ………………………………………………………………………….. 2

Will Saris, *Prehistoric Southwest Virginia: Aboriginal Occupation, Land Use, and Environmental Worldview*, 4 THE SMITHFIELD REVIEW 125 (2000) …………….... 5

# GLOSSARY

| | |
|---|---|
| Advisory Council | Advisory Council on Historic Preservation |
| Certificate Order | *Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232 (June 18, 2020) |
| EIS | Environmental Impact Statement |
| JA | Joint Appendix |
| Mountain Valley | Mountain Valley Pipeline, LLC |
| NEPA | National Environmental Policy Act |
| Preservation Act | National Historic Preservation Act |
| Project | Mountain Valley Pipeline Southgate Project |
| Rehearing Order | *Mountain Valley Pipeline*, 172 FERC ¶ 61,261 (Sept. 17, 2020) |
| Rehearing Request | Request for Rehearing of the Order and Request to Reopen Consultation of the Monacan Indian Nation and the Sappony Indian Tribe (July 20, 2020) |
| Section 106 | Section 106 of the National Historic Preservation Act |
| Unanticipated Discoveries Plan | Plan for Unanticipated Discoveries of Historic Properties and Human Remains |

**JURISDICTIONAL STATEMENT**

The Tribes incorporate by reference the jurisdictional statement set forth in the Petitioners' Page-Proof Rule 30(c) Opening Brief, at 1-2, as if set forth verbatim. In addition, the Tribes—which were granted intervenor status by FERC in the proceedings below—sought rehearing of FERC's Certificate Order on July 20, 2021. *Notice Granting Late Interventions*, FED. ENERGY REG. COMM'N (Apr. 23, 2019) [JA-___]; Rehearing Request [JA-___]. Following the Petitioners' timely filing of a Petition for Review, the Tribes filed a timely Motion to Intervene on November 13, 2020,[1] which the Court granted on December 9, 2020. [JA-___].

**STATUTES AND REGULATIONS**

Pertinent statutes and regulations appear in the Petitioners' Addendum and the Addendum to this brief.

**STATEMENT OF ISSUES**

I.   Did FERC fail to conduct a lawful review of effects to historic properties as required under Section 106 of the National Historic Preservation Act?

II.  Did FERC fail to comply with its obligations to consult with the Tribes?

III. Did FERC improperly delegate consultation responsibilities to Mountain Valley Pipeline?

---

[1] Petitioners consented to the Motion.  Respondent did not oppose it.

1

IV.    Did FERC take a "hard look" at the Project's effects on cultural or historic resources as required by NEPA?

## STATEMENT OF THE CASE

The Tribes incorporate by reference the statement of the case set forth in the Petitioners' Page-Proof Rule 30(c) Opening Brief, at 3-11, as if set forth verbatim. In addition, on July 20, 2020, the Tribes sought a timely rehearing of FERC's Certificate Order.  [JA-___]. On November 13, 2020, the Tribes sought a timely review of FERC's Orders in this Court by filing an Unopposed Motion for Leave to Intervene as Petitioners.  [JA-___]. This Court granted the Motion on December 9, 2020.  [JA-___].

## SUMMARY OF ARGUMENT

History has shown that failure to include the voices of tribal communities in resolving development issues that affect their communities—such as the Mountain Valley Pipeline Project—leads to undesirable results. Consultation, therefore, is a critical part of the Federal-tribal relationship. White House Memorandum for the Heads of Executive Departments and Agencies (Nov. 5, 2009). Notwithstanding the importance and mandate for meaningful consultation, FERC failed to meet its consultation duties with the Monacan Indian Nation and the Sappony Tribe in approving the Project for a number of reasons.

First, FERC failed to conduct a lawful review of effects to historic properties as required under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108. Section 106 "requires federal agencies to consider the effect of their actions on certain historic or culturally significant sites and properties (expressly including those of Indian tribes) and to seek ways to mitigate those effects." *City of Tacoma v. Fed. Energy Reg. Comm'n*, 460 F.3d 53, 69 (D.C. Cir. 2006).

In carrying out those responsibilities, federal agencies must "consult with any Indian tribe . . . that attaches religious and cultural significance to" potentially affected properties[.] Agencies "must complete the [S]ection 106 process 'prior to the approval of the expenditure of any Federal funds on [a project] or prior to the issuance of any license.'" 36 C.F.R. § 800.1(c) (quoting 54 U.S.C. § 306108). Meaningful consultation with the Monacans and the Sappony is important for FERC—and the public—to have a full understanding of the adverse effects of the Project, including their nature and extent. 36 C.F.R. § 800.2(a)(4).

In addition, federal agencies owe federally recognized tribes, such as the Monacan Indian Nation, a duty of trust to consult meaningfully through government-to-government consultation and may not delegate its responsibilities to permit applicants, such as Mountain Valley Pipeline. FERC failed to satisfy these obligations.

3

Finally, FERC failed to take a "hard look" at impacts to historic and cultural resources as required by NEPA because of its reliance on a Section 106 review process that failed to include meaningful consultation with tribes. Therefore, the Court should vacate and remand FERC's decision to approve the Project.

## STANDING

The Monacans and the Sappony have deep and long-standing connections to the lands and cultural resources that will be impacted by the Project if it goes forward, and they should be allowed to defend those interests as intervenors on appeal, just as FERC allowed them to do when FERC granted the Tribe's request for intervenor status in the proceedings below.

The Monacan Indian Nation is a federally recognized tribe headquartered in Amherst, Virginia. Monacan Standing Decl. ¶ 2, ADD 140-41. The Monacans received federal recognition on January 29, 2018, following passage of the Thomasina E. Jordan Act of 2017, Pub. L. No. 115-121 (2018). The Monacans historically had, and continue to have, a strong presence in the Area of Potential Effects (APE) for the MVP Southgate Project. 36 C.F.R. § 800.16(d).[2] Monacan

---

[2] "Area of potential effects," commonly referred to as the "APE," means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking. *Id.*

4

people and their ancestors have lived in Virginia for several thousand years in areas extending from West Virginia to the fall lines of the James, Rappahannock, and Potomac Rivers and thereafter settling in towns along the Staunton and Roanoke River valleys. *Id.* at ¶ 4, ADD 141-42. *See generally* JEFFREY L. HANTMAN, MONACAN MILLENNIUM: A COLLABORATIVE ARCHAEOLOGY AND HISTORY OF VIRGINIA INDIAN PEOPLE (2018); Monacan Indian Nation, *Our History*, https://www.monacannation.com/our-history.html; Will Saris, *Prehistoric Southwest Virginia: Aboriginal Occupation, Land Use, and Environmental Worldview*, 4 THE SMITHFIELD REVIEW 125 (2000).

The Monacans have long inhabited the areas the Project proposes to cross. They attach deep cultural significance to the lands included in the proposed pipeline's right-of-way. *Id.* at ¶ 5, ADD 141-42. Furthermore, the Monacans ascribe cultural significance to the natural resources affected by this Project. *Id.* at ¶ 6, ADD 141-42. The Monacans connection to the forest and accompanying wildlife is deep and central to their existence as a people. *Id.* at ¶ 7, ADD 141-42.

The Sappony are recognized by the State of North Carolina and have contemporary headquarters in Person County, North Carolina and in Halifax County, Virginia. Sappony Standing Decl. ¶ 2, ADD 142-43. The Sappony Tribe was recognized by the State of North Carolina in 1911 and the Commonwealth of Virginia in 1913. The Sappony have a long-standing relationship with both the

5

Commonwealth and Colony of Virginia, including the execution of two treaties. *Id.* at ¶ 3, ADD 142-43. Like the Monacans, the Sappony also have long standing ties to the areas affected by the Project. *Id.* at ¶ 4, ADD 142-43. Historically, the Sappony were mobile and travelled frequently, spending much of their time within the watershed of the Roanoke River, an area directly threatened by the Project. *Id.* at ¶ 5, ADD 142-43. *See also* Buck Woodard et al., *The High Plains Sappony of Person County, North Carolina and Halifax County, Virginia*, COLL. OF WM. & MARY ANTHROPOLOGICAL RESEARCH REPORT SERIES (2017).

Some families within the Sappony descend partially from Cheraw Indians, a tribe based in Rockingham and Patrick Counties in North Carolina who joined with the Sappony due to historic disruptions of their own tribe. Sappony Standing Decl. at ¶ 6, ADD 142-43. *See also* Interview with Dante Desiderio, Exec. Dir., Sappony Tribe (Sept. 9, 2019); C.S. Everett, *Melungeon History and Myth*, 26 APPALACHIAN J. 358, 365-66. Several historic towns associated with the Sappony and the Cheraw are also at risk from the Project. Sappony Standing Decl. at ¶ 7, ADD 142-43. The modern Tribe includes descendants of individuals who historically lived in Rockingham County, North Carolina, again where Mountain Valley proposed to build the pipeline. *Id.* ¶ 8, ADD 142-43; C.S. Everett, *Melungeon History and Myth*, 26 APPALACHIAN J. 358, 365.

This Court can address the harm caused to the Tribes by vacating the Certificate Order and remanding to FERC. *See Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1259 (D.C. Cir. 1994). The Monacans have standing to sue on their own behalf as a federally-recognized Indian tribe, 28 U.S.C. § 1362, and have standing under the Natural Gas Act. 15 U.S.C. § 717r(b). The Sappony have standing to sue on their members' behalf, *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), and have standing under the Natural Gas Act. 15 U.S.C. § 717r(b). FERC granted intervenor status to both tribes on April 23, 2019. *Notice Granting Late Interventions*, FED. ENERGY REG. COMM'N (Apr. 23, 2019) [JA-___].

## ARGUMENT

### I.    STANDARD OF REVIEW

FERC's orders and compliance with NEPA and Section 106 of the Preservation Act are reviewed under the Administrative Procedure Act's arbitrary and capricious standard. *Myersville Citizens for a Rural Cmty., Inc. v. Fed. Energy Reg. Comm'n*, 783 F.3d 1301, 1308 (D.C. Cir. 2015). Findings of fact must be "supported by substantial evidence, 15 U.S.C. § 717r(b), that a "reasonable mind might accept as adequate to support a conclusion." *Colo. Interstate Gas Co. v. Fed. Energy Reg. Comm'n*, 599 F.3d 698, 704 (D.C. Cir. 2010).

Judicial review of agency actions under NEPA is available "to ensure that the agency has adequately considered and disclosed the environmental impact of its

actions and that its decision is not arbitrary or capricious." *Del. Riverkeeper Network v. Fed. Energy Reg. Comm'n*, 753 F.3d 1304, 1312-13 (D.C. Cir. 2014). Federal agencies must comply with "principles of reasoned decisionmaking, NEPA's policy of public scrutiny, and [the Council of Environmental Quality's] own regulations." *Id.* Likewise, appellate courts review FERC's decisions involving compliance with Section 106 of the National Historic Preservation Act to determine whether the agency's actions are "reasonable." *Duncan's Point Lot Owners Ass'n Inc. v. Fed. Energy Reg. Comm'n*, 522 F.3d 371, 377 (D.C. Cir. 2008).

II. **FERC FAILED TO CONDUCT A LAWFUL REVIEW OF EFFECTS TO HISTORIC PROPERTIES AS REQUIRED UNDER SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT.**

FERC failed to conduct a lawful review of effects to historic properties as required under Section 106 of the National Historic Preservation Act ("Preservation Act"), 54 U.S.C. § 306108. As part of the federal government's policy of protecting the nation's historic heritage and sense of orientation as an American people, Section 106 requires federal agencies to consider the effects on historic properties of projects they carry out, assist, fund, permit, license, or approve throughout the country. 54 U.S.C. §§ 300101-307108; Section 1 of the Preservation Act, Pub. L. No. 89-665 (1966), as amended by Pub. L. No. 96-515 (1980). If a federal or federally-assisted project has the potential to affect historic properties listed or determined eligible for

8

listing in the National Register of Historic Places, a Section 106 review is required. 54 U.S.C. § 306108.

During Section 106 review, once historic properties have been identified, the federal agency charged with permitting the proposed project must find ways to avoid, minimize, or mitigate adverse effects to those properties in consultation with parties who have a demonstrated interest in the undertaking. 36 C.F.R. § 800.1(a). Federal agencies have a mandatory duty to consult meaningfully with federally recognized American Indian tribes as part of the consultation process if tribes have connections to properties that the proposed project is expected to harm. *See, e.g.,* 54 U.S.C. § 306108, 36 C.F.R. § 800.2(c)(2); Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 9, 2000); Advisory Council on Hist. Pres., *Consultation Process Pursuant to E.O. 13175: Consultation and Coordination with Indian Tribal Governments* (Feb. 3, 2010).

Additionally, THE SECRETARY OF THE INTERIOR'S STANDARDS AND GUIDELINES FOR FEDERAL AGENCY HISTORIC PRESERVATION PROGRAMS PURSUANT TO THE NATIONAL HISTORIC PRESERVATION ACT (Apr. 24, 1998) provides: "Consultation means the process of seeking, discussing, and considering the views of others, and, where feasible, seeking agreement with them on how historic properties should be identified, considered, and managed." ADD 122. President Biden reaffirmed this obligation in his Memorandum of January 26, 2021, which

9

provides: "It is a priority of my Administration to make respect for Tribal sovereignty and self-governance, commitment to fulfilling Federal trust and treaty responsibilities to Tribal Nations, and regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy." Tribal Consultation and Strengthening Nation-to-Nation Relationships, WHITE HOUSE, 86 FED. REG. 7491 (Jan. 26, 2021), ADD 136.

Section 106 "requires federal agencies to consider the effect of their actions on certain historic or culturally significant sites and properties (expressly including those of Indian tribes) and to seek ways to mitigate those effects." *City of Tacoma v. Fed. Energy Reg. Comm'n*, 460 F.3d 53, 69 (D.C. Cir. 2006). In carrying out those responsibilities, federal agencies must "consult with any Indian tribe . . . that attaches religious and cultural significance to" potentially affected properties. . . . Agencies "must complete the [S]ection 106 process 'prior to the approval of the expenditure of any Federal funds on [a project] or prior to the issuance of any license.'" 36 C.F.R. § 800.1(c) (quoting 54 U.S.C. § 306108).

In addition, regulations at 36 C.F.R. Part 800 promulgated by the Advisory Council on Historic Preservation ("Advisory Council"), which are binding on FERC, lay out a step-by-step process for identifying historic properties, determining their eligibility, assessing adverse effects, and seeking to resolve them. FERC is responsible for compliance with the Preservation Act, a responsibility that cannot be

10

delegated. 36 C.F.R. § 800.4. The regulations further require that the agency official "shall involve the consulting parties . . . in findings and determinations made during the section 106 process." 36 C.F.R. § 800.2(4). *See also*, *e.g.,* 54 U.S.C. § 306108 (federal agencies must "take into account" the effects of their undertakings); 36 C.F.R. § 800.6 (federal agency officials shall consult with consulting parties, including Indian tribes, to develop and evaluate alternatives to the undertaking that could avoid, minimize, or mitigate adverse effects). Section 106 requires FERC to consult with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by an undertaking, and this requirement applies regardless of the location of the historic property. 36 C.F.R.§ 800.2(c)(2).

Here, FERC failed to consult with Tribes at every stage of the Section 106 process. In this case, the Monacan Indian Nation and the Sappony Tribe each requested to be consulted in the Section 106 process as early as the pre-filing stage. *See Monacan Indian Nation Renewed Request for Consultation* (Nov. 11, 2019); *Sappony Tribe Renewed Request for Consultation* (Feb. 25, 2019); *Sappony Tribe Renewed Request for Consultation* (Nov. 16, 2018); *Sappony Tribe Request for Consultation* (Aug. 2, 2018) [JA-___]. The Monacan Indian Nation, a federally recognized tribe, was invited to consultation. *Comment of Monacan Indian Nation accepting invitation to tribal consultation* (Nov. 16, 2018) [JA-___]. The Sappony never received the courtesy of a response from FERC to its request for consulting

11

party status, although the Sappony's petition to intervene was accepted. [JA-___].

Indeed, the first time that the Sappony discovered that FERC considered the

Sappony a consulting party was in the Certificate Order in a section discussing the

signatories to the Programmatic Agreement, which reads "because the Monacan

Indian Nation and the Sappony Tribe are considered to be consulting parties, the

Commission invited the tribes to sign the agreement as concurring parties."

*Mountain Valley Pipeline, LLC*, 171 FERC § 61,232 (June 18, 2020) ("Certificate

Order"), Para. 117 [JA-___].

We note the obligations of FERC pursuant to the Preservation Act to consult

with federally recognized tribes and members of the community who have interests

in projects are separate from and are not superseded by FERC's *ex parte* rules.

Regardless of their status in the proceeding, neither Tribe was afforded opportunities

to participate in the Section 106 process as required by law. The Section 106

regulations plainly state that FERC "shall ensure that consultation in the section 106

process provides the Indian tribe or Native Hawaiian organization a reasonable

opportunity to identify its concerns about historic properties, advise on the

identification and evaluation of historic properties, including those of traditional

religious and cultural importance, articulate its views on the undertaking's effects on

such properties, and participate in the resolution of adverse effects." 36 C.F.R. §

800.2(c)(2)(ii)(A).

12

In this case, FERC failed to ensure reasonable opportunities existed for the Tribes to identify their concerns, advise on the identification and evaluation of historic properties, including those of traditional religious importance, to articulate their views on the undertaking's effects on such properties, and to participate in the resolution of adverse effects. FERC's assertion that "[c]ommission staff consulted with the State Historic Preservation Officers of Virginia and North Carolina, interested Indian tribes, and other consulting parties prior to making determinations regarding National Register of Historic Places (NRHP) eligibility and project effects" is simply inaccurate. Certificate Order at Para. 112 [JA-___].

Federal agencies owe federally recognized tribes, such as the Nation, a duty to consult meaningfully through government-to-government consultation and pursuant to Section 106 of the Preservation Act. Moreover, FERC never adequately considered comments submitted by the Sappony, despite allowing the Tribe to intervene. *Notice Granting Late Interventions*, FED. ENERGY REG. COMM'N (Apr. 23, 2019) [JA-___]. FERC held one initial scoping meeting with the Monacan Indian Nation at which FERC merely explained the review process to the Nation, held no such meeting the Sappony, and did not respond to a single comment or request for information from either Tribe. *See Southgate Project Final Envt'l Impact Statement*, Fed. Energy Reg. Comm'n (Feb. 2020), Sec. 4.1.1.2, App. E-3 Table 4.10.10-2; Letter from James Martin, Chief Gas Branch 3, Fed. Energy Reg. Comm'n, to Roger

13

Kirchen, Dir., Va. Dep't of Hist. Res. at 2 (April 1, 2020) (describing contested version of events at the only meeting to occur) [JA-___]. Consultation under the Preservation Act is "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the Section 106 process." 36 C.F.R. § 800.16(f).

No such "seeking, discussing, and considering" of the views of other participants occurred. Instead, the Tribes received draft and final cultural resources reports in a fashion that was not timely for providing input, and many of the Tribes' requests to improve cultural resources identification and assessment were ignored by Mountain Valley's consultants. *Southgate Project Final Envt'l Impact Statement*, Fed. Energy Reg. Comm'n (Feb. 2020); *Southgate Project Draft Envt'l Impact Statement*, Fed. Energy Reg. Comm'n (July 2019) [JA-___]. Mountain Valley did not provide cultural resources reports underlying the Final EIS until nearly a month after the Draft Programmatic Agreement comments were due, and three weeks after the Final EIS was published. Cultural Resources Report, Mountain Valley Pipeline LLC (Docket No. CP19-14-000) (on file with Fed. Energy Reg. Comm'n). [JA-___]. The Tribes received Phase II cultural resources reports for 31RK259, a Late Woodland site in Rockingham County, in February 2020 while the Treatment Plan for the site was received October 2, 2019 and comments were expected that November. [JA-___].

14

Mountain Valley ignored multiple requests from the Tribes to participate as tribal monitors on the project, to enable tribal attendance during the survey effort, and to provide tribal knowledge for site assessments.

Finally, the Tribes requested draft cultural resources reports as soon as they were provided to State Historic Preservation Officers, but instead Mountain Valley and FERC required a sweeping nondisclosure agreement to be signed by any members of tribal leadership or the Tribe generally who wished to review information about project impacts. Confidentiality and Protective Agreement (Docket No. CP19-14-000) (Feb. 1, 2019) [JA-___]. These agreements limited tribal decision-making processes by delaying and preventing participation from tribal members who were not comfortable signing such a document.

Perhaps most egregiously, the Tribes were not given any opportunity to participate in the resolution of adverse effects. 36 C.F.R. § 800.6 requires FERC to consult with State Historic Preservation Officers, Tribal Historic Preservation Officers, and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.

In this case, FERC gave the tribes no opportunity to develop and evaluate alternatives or modifications to the Programmatic Agreement, which is supposed to

15

be the result of this process of developing and evaluating alternatives or modifications, and the product of consultation on how to resolve adverse effects. 36 C.F.R. § 800.2(a)(4). *See also* ADVISORY COUNCIL ON HIST. PRES., *Guidance on Agreement Documents*, *available at* https://www.achp.gov/initiatives/guidance-agreement-documents. But FERC held zero consulting party meetings during which such collaboration could occur. FERC's assertion that a single meeting with the Monacans' representatives at the initial scoping stages of the Project fulfilled this obligation—even though no historic property surveys had been completed—is patently absurd. Certificate Order at Para. 119 [JA-___].  FERC's assertion that "many issues" were discussed is simply not true.  Martin Letter, *supra*, at 13.

The sum total of FERC's attempt to resolve adverse effects was to email the Monacan Indian Nation a draft Programmatic Agreement that was copied and pasted from another project. The Sappony, whom FERC now acknowledges was a consulting party, was not even sent the draft Programmatic Agreement. The Nation and the Sappony immediately objected to this failure to solicit their views on resolution of adverse effects, requested consultation, and received no response. *Sappony Tribe's Comments on the Draft Programmatic Agreement* (Feb. 7, 2020); *Monacan Indian Nation's Comments on the Draft Programmatic Agreement* (Feb. 7, 2020); *Sappony Tribe's Objection to the Draft Programmatic Agreement for the Southgate Extension* (Jan. 16, 2020). [JA-___].

The North Carolina State Historic Preservation Officer recognized the Sappony's interest in the project, and in their comments on the Draft Programmatic Agreement they asked for the Sappony to be added to the Programmatic Agreement. [JA-___]. FERC responded to the State Historic Preservation Officer by adding the Sappony, although FERC spelled the Tribe's name wrong and did not attempt to engage the Sappony in any way. *Final Programmatic Agreement*, Fed. Energy Reg. Comm'n (Mar. 10, 2020) [JA-___].

In this case, the Tribes were so frustrated by FERC's failure to respond to their repeated requests for consultation on the Programmatic Agreement that they reached out to the Virginia State Historic Preservation Office for counsel. Letter from Marion Werkheiser, Managing Partner, Cultural Heritage Partners, to Paul Friedman, Fed. Energy Reg. Comm'n (Mar. 25, 2020). [JA-___]. The Virginia State Historic Preservation Office presented some of the Tribes' concerns to FERC in its own letter, but the Tribes should not have to send or receive information third-hand from FERC. Consultation should instead "involve direct contact between agencies and tribes and should recognize the status of the tribes as governmental sovereigns." Letter from Roger Kirchin, Va. Hist. Pres. Office, to Paul Friedman, Fed. Energy Reg. Comm'n (Apr. 1, 2020). [JA-___]. *See also* 18 C.F.R. § 2.1c (providing a policy statement for consultation with tribes in Commission proceedings) and Fed. Energy Reg. Comm'n, *Revision to Policy Statement on Consultation with Indian Tribes in*

17

*Commission Proceedings*, 18 C.F.R. Part 2, 84 Fed. Reg. 56940 (Oct. 2019). The law requires direct government-to-government consultation, which did not take place here.

Executing the Programmatic Agreement over the objections of the Tribes is not sufficient for compliance with the Preservation Act. FERC states that "By developing and executing an agreement document with the North Carolina and Virginia State Historic Preservation Officers, in order to resolve adverse effects on historic properties affected by the Southgate Project, the Commission has complied with both the letter and spirit of section 106 of the [Preservation Act]." Certificate Order at Para. 116 [JA-___]. FERC, however, failed to comply with either the spirit or the letter of Section 106, which requires meaningful involvement with all consulting parties *prior* to drafting any agreement. *See* ADVISORY COUNCIL ON HIST. PRES., Before You Draft, *Guidance on Agreement Documents*, *available at* https://www.achp.gov/before_you_draft.

The Certificate Order further states the "Execution of the programmatic agreement by the Commission, the North Carolina [State Historic Preservation Officer], and the Virginia [State Historic Preservation Officer] concludes the [Preservation Act] section 106 process." *Id.* Yet the Programmatic Agreement further exacerbates the problems with the Section 106 process by denying Tribes input on each stage of the Section 106 analysis prospectively. The Programmatic

18

Agreement not only falls short of addressing the inadequate Section 106 consultation practices thus far in the Project, but also creates a system in which those problems will only be compounded and repeated in the future. The Programmatic Agreement does not include provisions for Tribes to be consulted on identification of historic properties, assessments of eligibility, assessments of effects, and resolution of effects (*i.e.,* every step of the Section 106 process).[3]

Instead, FERC or the Project Archaeologist are the ones to determine whether any Tribes are affected, and only then would any tribes be notified of newly discovered properties. [JA-___]. In fact, the Tribes are given no decision-making role at all on whether and how human remains discovered during construction would be repatriated, reburied, or curated. *Id.* FERC's failure to exercise the basic duty of care by removing the Tribes from any input into how their ancestors' remains are treated is a violation of the agency's fiduciary duty to the Tribes.

FERC claims that "Commission staff made substantial changes to the final programmatic agreement based on comments received from the Virginia and North Carolina [State Historic Preservation Offices]." Certificate Order at Para. 118 [JA-

---

[3] Programmatic Agreements are allowed pursuant to Section 106, but only under certain circumstances, such as when "effects on historic properties cannot be fully determined prior to approval of any undertaking." 36 C.F.R. § 800.14(b)(1)(i)-(ii). Tribes' views must always be taken into account where the Programmatic Agreement "has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to the Indian tribe." *Id.* § 800.14(b)(1)(i), (f).

___]. FERC provides no support or examples for this assertion, which is in direct contradiction to the Tribes' view of the Final Programmatic Agreement. Although minor changes—such as the misspelling of the Sappony Tribe's name—were corrected, the substance of the concerns were not addressed. [JA-___].

Because FERC failed to consult the Tribes at each stage of the Section 106 process and failed to carry out the Section 106 process as required by law, the Commission may not lawfully issue a Certificate. 36 C.F.R. § 800.1(c).

### III.    FERC FAILED TO CONSULT WITH THE TRIBES.

FERC violated its responsibility to consult with the Tribes and its own rules in failing to consult with the Monacans on a government-to-government basis. The federal government's fiduciary responsibility to Tribes is well established through caselaw, executive orders, statutes, regulations, and agency guidance. This relationship between the federal government and tribes "resembles that of a ward to his guardian," and is a responsibility that specifically includes meaningful consultation. A federal agency like FERC breaches that duty if it violates a statute— like the Preservation Act—that affects the rights of a tribe. Indeed, "the Commission acknowledges that, as an independent agency of the federal government, it has a trust responsibility to Indian tribes and this historic relationship requires it to adhere to certain fiduciary standards in its dealings with Indian tribes." 18 C.F.R. § 2.1c(b), ADD 89.

20

FERC's guidelines state, "consultation should involve direct contact between agencies and tribes and should recognize the status of the tribes as governmental sovereigns." 18 C.F.R. § 2.1c(a). The Trust responsibility requires meaningful government-to-government consultation, which did not take place with the Monacans, contrary to FERC's assertions. FERC has relied on a single meeting with the Monacans' representatives on January 17, 2019—at which the only topic of discussion was the lawful consulting process that was to follow—to say that meaningful consultation has occurred. FERC's statement Meaningful consultation did not occur at that meeting, and one meeting would never constitute meaningful consultation for the review of an entire pipeline project. *See Southgate Project Final Envt'l Impact Statement*, Fed. Energy Reg. Comm'n (Feb. 2020), Sect. 4.1.1.2, App. E-3 Table 4.10.10-2; Letter from James Martin, Chief Gas Branch 3, Fed. Energy Reg. Comm'n, to Roger Kirchen, Dir., Va. Dep't of Hist. Res. at 2 (April 1, 2020) (describing contested version of events at first meeting) ("Martin Letter"). [JA-___]. *See also Sappony Tribe's Response to FERC's Request for Comments on the Draft Programmatic Agreement* (Feb. 7, 2020); *Sappony Tribe's Objection to the Draft Programmatic Agreement for the Southgate Extension* (Jan. 16, 2020); *Sappony Tribe Response to Draft EIS* (Dec. 12, 2019); *Monacan Indian Nation Renewed Request for Consultation* (Nov. 11, 2019); *Monacan Indian Nation Response to Draft EIS* (Sep. 19, 2019); *Sappony Tribe Response to Draft EIS* (Sep. 16, 2019);

21

*Sappony Tribe's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019); *Monacan Indian Nation*'s *Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019); *Sappony Tribe Renewed Request for Consultation* (Feb. 25, 2019); *Monacan Indian Nation Request for Information and Additional Comments* (Feb. 20, 2019); *Sappony Tribe Renewed Request for Consultation* (Nov. 16, 2018); *Sappony Tribe Request for Consultation* (Aug. 2, 2018) (collectively, "Consultation Letters"). [JA-___].

Instead, that single meeting was an initial conversation where the Monacans introduced themselves and FERC explained procedurally how it would conduct the permitting process. *Id.* Furthermore, since the initial scoping meeting in January 2019, the Tribes have received no responses from FERC to their repeated requests for information and for clarifications.

The Tribes have repeatedly submitted comments seeking to correct FERC's mistakes. Consultation Letters, *supra*, at 21. FERC's conduct violates FERC's guidelines, which state, "consultation should involve direct contact between agencies and tribes and should recognize the status of the tribes as governmental sovereigns." 18 C.F.R. § 2.1c(a). As demonstrated above, FERC never consulted the Tribes as required by law.

In addition, FERC failed to act as a fiduciary of the Monacans as required by its federal trust responsibility. The Monacans repeatedly requested the opportunity

to discuss their concerns with FERC, to provide input on each stage of the Section 106 process, only to have their requests go unanswered and for the agency to move forward without the benefit of understanding their concerns. FERC cannot fulfill its fiduciary responsibilities if the agency is not informed about tribal interests. In this case, FERC repeatedly denied the Tribe opportunities to share information FERC required so that the agency could act in the best interests of the Monacans.

FERC's failure to respect its obligations under the law to consult with the Tribes is egregious, and this failure to consult has led to arbitrary decision-making in the analysis of impacts under NEPA and the Preservation Act. Specifically, FERC has:

a) Refused to respond to any of the Tribes' comment letters or requests submitted to the Docket. For almost two years, the Tribes have submitted comment letters only to be ignored. Consultation Letters, *supra*, at 21. [JA-___].

b) Refused to respond to the Sappony's requests to consult, filed August 2, 2018, November 16, 2018, February 25, 2019, January 16, 2020, and February 7, 2020. *Sappony Tribe's Response to FERC's Request for Comments on the Draft Programmatic Agreement* (Feb. 7, 2020); *Sappony Tribe's Objection to the Draft Programmatic Agreement for the Southgate Extension* (Jan. 16, 2020); *Sappony Tribe Renewed Request for Consultation* (Feb. 25, 2019); *Sappony Tribe Renewed Request for Consultation* (Nov. 16, 2018); *Sappony*

23

*Tribe Request for Consultation* (Aug. 2, 2018) (collectively, "Sappony Consultation Requests").

c) Mischaracterized the concerns and ancestral connections of the Tribes to the areas that Southgate will adversely affect. Despite the Monacans filing a letter on the docket on November 16, 2018 listing several critical sources to guide FERC's consultants in their analyses, the initial cultural resources reports required extensive tribal comment and research that rose to the level of what should have been paid consulting. *Comment of Monacan Indian Nation accepting invitation to tribal consultation* (Nov. 16, 2018) [JA-___]. Indeed, Mountain Valley's cultural resources consultant submitted outdated cultural history in its cultural resources surveys, mischaracterizing Sappony and Monacan histories of the project area. The Tribes filed comments requesting that these flawed interpretations and assessments be corrected, but they were not, which led FERC to misunderstand the impacts of the project. The cultural resources background literature ignored and excluded significant tribal history. The limited 19th-century tribal history wrongly minimized Monacan interest in the project area. For example, Mountain Valley's cultural resources consultant identified the Catawba Indian Nation as the predominant federally-recognized tribe with a significant interest in the area, characterizing Monacan relatedness to the project as on par with Chesapeake Tidewater federally-

24

recognized tribes. FERC did not fully resolve these mischaracterizations in the Final EIS, which continues to hedge assertions that the Monacans were connected with Tutelo-Sapponi communities such as Occaneechi Town or that Jeffrey Hantman, a scholar on Monacan history, asserts that the Hurt Power Plant site (44PY144) and the Graham-White site (44RN21) near the project area are likely associated with the Monacans. *See Monacan Indian Nation Comments on Cultural Resources Impacted by Southgate extension of the Mountain Valley Pipeline* (June 28, 2019) (privileged filing, on file with FERC and the Tribes) [JA-___].

d) Refused to take into account the Tribes' special expertise to identify historic properties and cultural resources. As explained above, the Tribes offered their expertise in this critical first step of the Section 106 process, only to be ignored.  [JA-___].

For all of these reasons, FERC cannot demonstrate that it met its responsibility to the Tribes.

## IV.    FERC CANNOT DELEGATE ITS RESPONSIBILITIES UNDER SECTION 106 AND IS RESPONSIBLE FOR MOUNTAIN VALLEY'S FAILURE TO COORDINATE PROPERLY.

FERC is responsible for compliance with Section 106 of the Preservation Act, a responsibility that cannot be delegated. 36 C.F.R. § 800.4. As the Advisory Council, the lead federal agency charged with Section 106 compliance, has

25

explained, "[F]ederal agencies cannot unilaterally delegate their tribal consultation responsibilities to an applicant." Advisory Council on Hist. Pres., *Limitations on the Delegation of Authority by Federal Agencies to Initiate Tribal Consultation under Section 106 of the National Historic Preservation Act* (July 1, 2011). ADD 116. In addition, "it is not appropriate to assume that the lack of written or verbal response by a tribe to an applicant's outreach signifies a lack of interest in the project or waiver of its right to consultation[.]" *Id.* at 2. ADD 116.

In this case, FERC seems to have improperly delegated its Section 106 consultation obligations to Mountain Valley, which did not properly coordinate with either of the Tribes. Furthermore, the federal agency remains responsible for ensuring that consultation comply with Section 106 of the Preservation Act, and may not delegate its responsibility of government-to-government consultation. FERC failed at both these measures.

As evidence of how FERC failed to comply with its tribal consultation duties by improperly delegating authority to Mountain Valley, James Martin of FERC, in a letter to the Virginia State Historic Preservation Office responding to the Tribes' objections concerning the Programmatic Agreement and Unanticipated Discoveries Plan—an integral part of the Programmatic Agreement—stated, "The [Unanticipated Discoveries Plan] is a product produced by Mountain Valley Pipeline LLC, *not by FERC staff*." Martin Letter, *supra*, at 13 (emphasis added). [JA-__].

26

Furthermore, FERC left it to Mountain Valley to file responses to the Tribe's comments. *Id.* This sort of blanket delegation is not how meaningful consultation is supposed to work under the letter and spirit of Section 106 or under FERC's independent duty to consult on a government-to-government basis. Mountain Valley failed on several instances to engage with or respond to the Tribes' repeated concerns on the Project, another violation of the non-delegation rule. For example, Mountain Valley:

a) Ignored or failed to timely provide answers to the Tribes' repeated requests for tribal monitors and communications about ongoing cultural resources work, including:

    i.   Direct requests to Mountain Valley on February 27, 2019 and March 29, 2019, directed to Agnes Ramsey. Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners, to Agnes Ramsey, Tribal Liaison, Mountain Valley Pipeline (Feb. 27, 2019); Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners to Agnes Ramsey, Tribal Liaison, Mountain Valley Pipeline (Mar. 25, 2019) [JA-___].

   ii.   Request for information about ongoing cultural resources work in July 1, 2019 letter on the FERC docket. *Sappony Tribe's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019);

27

*Monacan Indian Nation's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019) [JA-___].

iii. Renewed request for information about planned archaeological testing on pre-Contact sites in letter on the docket on September 16, 2019. *Sappony Tribe Response to Draft EIS* (Sep. 16, 2019) [JA-___].

iv. Renewed request for ongoing and active communication regarding planned archaeological testing on pre-Contact sites in a letter on the docket on December 12, 2019. *Sappony Tribe Response to Draft EIS* (Dec. 12, 2019) [JA-___].

b) Ignored the Tribes' requests for oral history research as a component of the cultural resources assessment. *See Sappony Tribe Response to Draft EIS* (Dec. 12, 2019); *Sappony Tribe Response to Draft EIS* (Sep. 16, 2019); *Sappony Tribe's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019); *Monacan Indian Nation's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019) [JA-___].

c) Ignored the Tribes' requests to speak directly with NextEra's cultural resources consultant. *See* Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners to Agnes Ramsey, Tribal Liaison, Mountain Valley Pipeline (Feb. 27, 2019); Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners, to Agnes Ramsey,

Tribal Liaison, Mountain Valley Pipeline (Mar. 25, 2019); *Sappony Tribe Response to Draft EIS* (Dec. 12, 2019); *Sappony Tribe Response to Draft EIS* (Sep. 16, 2019); *Sappony Tribe's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019); *Monacan Indian Nation's Comments on Cultural Resources Impacted by the Southgate extension* (July 1, 2019) [JA-___].

d) Ignored the Tribes' requests for cultural resources reports in draft form, information on known historic cemeteries, shapefiles and important mapping data, that Mountain Valley list Siouan tribes in the Unanticipated Discoveries Plan, and that FERC and Mountain Valley organize Siouan ownership of artifacts. *See, e.g., Monacan Indian Nation Request for Information and Additional Comments* (Feb. 20, 2019) [JA-___].

e) Ignored requests for tree cutting plans. *See, e.g.,* Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners, to Agnes Ramsey, Tribal Liaison, Mountain Valley Pipeline (Feb. 27, 2019); Email from Ellen Chapman, Cultural Resource Specialist, Cultural Heritage Partners, to Agnes Ramsey, Tribal Liaison, Mountain Valley Pipeline (Mar. 25, 2019) [JA-___].

f) Failed to object or attempt to correct FERC's failure to respond to the Tribes, to include them in the Programmatic Agreement, and to consult them on the Section 106 process.

g) Failed to object to provisions in the Programmatic Agreement that should be offensive to any company familiar with Indian tribes. For example, they completely ignored FERC's failure to provide for Tribes to have a role in decision-making regarding whether and how human remains discovered during construction would be repatriated, reburied, or curated; and FERC's failure to include provisions for Tribes to be consulted on identification of historic properties, assessments of eligibility, assessments of effects, and resolution of effects (*i.e.,* every step of the Section 106 process).

h) Produced an Unanticipated Discoveries Plan that falls short and fails to include notifying the Sappony Tribe in the event of unanticipated discoveries. [JA-___].

Finally, FERC failed to comply with the formal request to FERC from Virginia's Department of Historical Resources to "reopen consultation on the Unanticipated Discoveries Plan . . . to explore ways in which the Tribes may be more involved in determinations of significance of any discoveries." Letter from Roger Kirchen, Va. Dep't of Hist. Res., to Paul Friedman, Archaeologist, Fed. Energy Reg. Comm'n (May 18, 2020) [JA-___].

As of the date of this writing, FERC has not contacted the Tribes. Instead, FERC claims, "We are satisfied that Mountain Valley has developed appropriate protocols for addressing unanticipated discoveries during project construction, and

30

that Mountain Valley will seek input from the Tribes regarding any discoveries, as appropriate." Certificate Order at Para 123 [JA-___].

### V.     FERC DID NOT TAKE A "HARD LOOK" AT THE EFFECTS ON CULTURAL OR HISTORIC RESOURCES AS REQUIRED BY NEPA.

By not consulting with the Tribes whose cultural and historic resources are most affected by this project, FERC failed to uphold its obligation under NEPA. "Pursuant to NEPA's 'hard look' requirement, the agency must ensure that 'the adverse environmental effects of the proposed action are adequately identified and evaluated.'" *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 123 (D.C. Cir. 2017) (internal citations omitted). In taking a "hard look" FERC must specifically consider the '[u]nique characteristics of the geographic area such as proximity to historic or cultural resources'; . . . and the degree to which the action 'may cause loss or destruction of significant . . . cultural[] or historical resources.'" 40 C.F.R. § 1508.27. *See also Standing Rock*, 255 F. Supp. 3d at 123. By failing to consult with either Tribe, FERC could not have properly identified or evaluated significant cultural or historic resources.

Furthermore, FERC's decision to issue the certificate without actively seeking information from the Tribes is the definition of uninformed agency action. Although NEPA does not mandate particular outcomes, the statute "prohibits uninformed— rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council,*

490 U.S. 332, 351 (1989); *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 184 (4th Cir. 2005). FERC's actions in issuing this certificate are indeed uninformed, and have led to an arbitrary result. Consultation with Tribes provides agencies with crucial information on historic and cultural resources. Without consulting Tribes whose resources are most affected, there is simply no way that FERC made an informed decision or took a "hard look" at how the MVP's pipeline would affect the unique characteristics of its surrounding area.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, FERC's decision to approve the Project was arbitrary, capricious, and contrary to law. The Tribes request that the Court vacate and remand FERC's Orders so that meaningful consultation with the Tribes can occur as required by Section 106 of the Preservation Act and NEPA.

Dated:  April 1, 2021                    Respectfully submitted,

*/s/ William J. Cook*
L. Eden Burgess (D.C. Cir. Bar No. 49501)
William J. Cook (D.C. Cir. Bar No. pending)
Cultural Heritage Partners, PLLC
2101 L St., NW; Suite 800
Washington, DC  20037
(202) 567-7594
eden@culturalheritagepartners.com
will@culturalheritagepartners.com

*Counsel for Intervenors Monacan Indian Nation and Sappony Tribe*

32

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 7,145 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B) and D.C. Cir. Rule 32(3)(1). Microsoft Word 2016 computed the word count.

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (Microsoft 2016 Times New Roman) in 14-point font.

Dated:  April 1, 2021

*/s/ William J. Cook*
L. Eden Burgess (D.C. Cir. Bar No. 49501)
William J. Cook (D.C. Cir. Bar No. pending)
Cultural Heritage Partners, PLLC
2101 L St., NW; Suite 800
Washington, DC  20037
(202) 567-7594
eden@culturalheritagepartners.com
will@culturalheritagepartners.com

*Counsel for Intervenors Monacan Indian Nation and Sappony Tribe*

## CERTIFICATE OF COUNSEL

In accordance with Circuit Rule 28(d)(4), I hereby certify that a separate brief for the Intervenors Monacan Indian Nation and Sappony Tribe is necessary due to the specialized factual and legal issues involving federal historic preservation and cultural heritage law, including federal government consultation responsibilities to tribes, that are unique to the Tribes and no other intervenor.

Dated:  April 1, 2021

*/s/ William J. Cook*
L. Eden Burgess (D.C. Cir. Bar No. 49501)
William J. Cook (D.C. Cir. Bar No. pending)
Cultural Heritage Partners, PLLC
2101 L St., NW; Suite 800
Washington, DC  20037
(202) 567-7594
eden@culturalheritagepartners.com
will@culturalheritagepartners.com

*Counsel for Intervenors Monacan Indian Nation and Sappony Tribe*

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2021, I electronically filed the foregoing Intervenors Monacan Indian Nation and Sappony Tribe's Corrected Page-Proof Rule 30(c) Opening Brief with the Clerk of the Court by using the appellate CM/ECF System and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

/s/ William J. Cook
William J. Cook
Cultural Heritage Partners, PLLC
2101 L St., NW; Suite 800
Washington, DC  20037
(202) 567-7594
will@culturalheritagepartners.com